UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VERNICE RAY ROBINSON,

       Petitioner,

                                   Case No. 10-14958

v.

                                   HON. AVERN COHN

PAUL KLEE,

       Respondent.

_____/

## MEMORANDUM AND ORDER
## DENYING PETITION FOR WRIT OF HABEAS CORPUS
## AND
## DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

### I. Introduction

       This is a habeas case under 28 U.S.C. § 2254.  Petitioner Vernice Ray Robinson ("Petitioner") challenges his state court convictions for criminal sexual conduct, kidnapping, assault with intent to commit great bodily harm less than murder, assault with a dangerous weapon, and possession of a firearm during the commission of a felony.  His convictions arose from the claim that Petitioner raped and tortured his pregnant cousin, A.D.,[1] and aided and abetted another man in raping A.D.  Petitioner claim in an amended petition, which he filed through counsel, that the trial court erred by permitting A.D.'s out-of-court statements to be admitted in evidence, the prosecutor improperly commented on Petitioner's probation status, the late endorsement of a prosecution witness deprived Petitioner of notice and due process, the evidence at trial was not sufficient to sustain Petitioner's convictions, and trial and appellate counsel were ineffective.  Respondent Paul Klee ("Respondent") responds that Petitioner's

_____

[1]  The Court refers to the complaining witness by her initials.

claims are time-barred, procedurally defaulted, and meritless. The Court agrees that Petitioner's claims do not warrant habeas relief. As such, the petition will be denied. The reasons follow.

## II. Background and Procedural History

Due to the nature of Petitioner's claims as well as the case's rather complicated procedural history, a detailed recitation of the trial record and history of Petitioner's various appeals is necessary.

## A. Prosecution Witnesses

Kimberly Hurst, a sexual assault forensic examiner, testified that she examined A.D. at the hospital on July 3, 2004. Hurst said that A. D. had twelve burns and several other bruises and injuries on her body. These burns, bruises, and injuries, as well as A.D.'s comments, were consistent with a physical and sexual assault. Hurst also testified that A.D. informed her Hurst that "Vern" beat her with a gun, tied her to a pole with a yellow rope, burned her with a hot clothes hanger, and sexually assaulted her.

Detroit police officer and evidence technician Lori Briggs testified that, on July 19, 2004, she was dispatched to a dwelling at 6377 Selkirk Street in Detroit to take photographs and to collect evidence. In the basement, she found a chair with a cord and yellow rope around it and three spent bullets. She found a loaded twelve-gauge shotgun in the bedroom of the house, and, in a garbage bag on the first floor, she found a wire hanger and condoms.

A.D. testified that Petitioner was her cousin and that, on June 30, 2004, she called Petitioner and asked him to pick her up because she and her baby's father had decided to separate. She had a Mossberg pump rifle and an AK-47 rifle with her when

2

Petitioner picked her up and took her to the house on Selkirk, which belonged to Petitioner's brother.  She sold the AK-47 to Petitioner for $750, but he gave her only $250 and stated that he would give her the rest of the money in the morning when his wife came over.  Petitioner's wife subsequently took A.D. and her daughter shopping.

A.D. further testified that she returned to the house on Selkirk and spent the night there without incident.  The next day (July 1, 2004), she left the house and dropped off her daughter at her mother's home.  Petitioner subsequently called her and accused her of stealing his money and handguns.  She went back to the house on Selkirk to inform Petitioner that he was accusing her of something she did not do.  After she arrived there, Petitioner accused her and another woman of stealing his money.  He choked her, punched her in the face, hit her on the head with a handgun, and stomped on her stomach.  He also pointed a gun at her head, told her to strip, and then inserted his penis in her vagina against her will.  He later made her go to the basement where he tied her with cords and burned her with a hot clothes hanger.  Petitioner fired a gun in the basement and permitted a man named "D" to penetrate her vagina with his penis while Petitioner held a gun.  She remained in the basement until that night when Petitioner permitted her to dress and go upstairs.  She escaped about 2:00 a.m. the next day after Petitioner left the house.  She then walked to her mother's house where she reported the incident to the police.  She subsequently went to St. John Hospital and was examined by Hurst.

Detroit Police Officer Stacy Cavin testified that she and Officer Barrett were dispatched to an apartment building on Grover Street in Detroit between 4:30 and 5:00 a.m. on July 3, 2004.  Inside one of the apartments, A.D. told her that she had been

raped.  A.D. had some marks on her arms and legs, and a medic conveyed her to the hospital.

James Wiencek was the Detroit police officer in charge of the case.  He made contact with A.D. on July 14, 2004.  He testified that A.D. told him that she had been sexually penetrated and that she wanted to proceed with a prosecution.  Wiencek testified that he had no reason to doubt A.D.'s allegations, and she subsequently directed him to the home on Selkirk Street where the assault occurred.  A search warrant was executed at the home on July 19, 2004.  A shotgun was found in the bedroom, condoms and a wire hanger were found in the trash can in the kitchen, and a rope and extension cord were tied to a pole in the basement.  Officer Wiencek further testified that he learned that Petitioner had gone to Ohio.  He also testified that he transferred to a different police unit in January and did not become aware that Petitioner had been arrested and was scheduled for trial until he (Wiencek) was subpoenaed for trial.

Police Officer Kimree Beckem took a statement from A.D. at John Hospital on July 3, 2004.  A.D. stated that Petitioner choked her, punched and kicked her, hit her with a gun, had sex with her, and tortured her with a hot clothes hanger after accusing her of taking his money, dope, and guns.  Additionally, Petitioner had "his boy D" penetrate her vagina with his penis.  Officer Beckem further testified that A.D. told her that she went to the house to prove that she did not do anything wrong, and that she finally escaped after Petitioner left the house.

Glen Hall, a supervisor at the Detroit Police Crime Laboratory, testified that there were no sperm or semen in swabs taken from A.D. or on four condoms found at the

4

house on Selkirk.  Police Officer Lloyd Allen testified as an expert in firearms examination and identification.  He opined that the three nine-millimeter spent bullets in evidence were all fired from the same gun.

### B.  Defense and Rebuttal Witnesses

Trial counsel recalled Officer Stacey Cavin, who testified about the crime report that she prepared after speaking with A.D. on July 3, 2004.  Cavin testified that A.D. had said three, not two, people sexually assaulted her and that Petitioner sexually assaulted her in the basement, not the bedroom.  Cavin also said that A.D. had failed to mention that she was struck with a gun.

Trial counsel also called Gregory Barrett, who was Officer Cavin's partner on July 3, 2004.  Barrett had no independent recollection of what A.D. said to Cavin.

Dr. Curt Wimmer testified for the defense that he saw A.D. in the emergency room at St. John Hospital.  He described A.D.'s demeanor as emotionally distraught, and her injuries minor.

Petitioner was the final defense witness.  When called, trial counsel asked Petitioner to state his name for the record and then indicated that he had no questions for Petitioner.  On cross-examination, Petitioner denied doing any of the things that A.D. said he did to her.  He testified that he saw A.D. come out of the house on Selkirk on either July 1 or July 2, 2004 and that he did not buy a weapon from her.  Instead, he gave her $50 to buy some school clothes for her daughter.  A few days later, A.D. called him and said that somebody named "D" had beat her up because she owed "D" some money.

Petitioner denied leaving the State of Michigan during July of 2004.  He testified that he went to his sister's home in Akron, Ohio in September of 2004 and that he had permission from his probation officer to leave the state.  He also testified that he reported to his probation officer in July and August of 2004 and that he first learned of A.D.'s accusations about him when he was arrested in Akron and extradited to Michigan.  He admitted that he had heard something about the case.  He further testified that he heard A.D. was making accusations about somebody by the name of "D."

On rebuttal, Charlotte Lemons testified that she was a probation supervisor for the Michigan Department of Corrections and that Petitioner had no permission to leave the state in 2004.  Lemons also testified that Petitioner last reported to his probation officer on June 16, 2004.  He failed to report, as required, in July and August of 2004.

### C.  The Verdict, Sentence, and Direct Appeal

The jury found Petitioner guilty, as charged, of kidnapping, M.C.L § 750.349, assault with intent to do great bodily harm less than murder, M.C.L. § 750.84, assault with a dangerous weapon, M.C.L. § 750.82, possession of a firearm during the commission of a felony, M.C.L. § 750.227b, and two counts of criminal sexual conduct in the first degree, M.C.L.§ 750.520b.

The trial court sentenced Petitioner as a habitual offender to concurrent terms of twenty to thirty years for the criminal sexual conduct and kidnapping, five to ten years for the assault with intent to do great bodily harm, and two to four years for the felonious assault.  Petitioner also received a consecutive sentence of two years in prison for possessing a firearm during the commission of a felony.

6

Petitioner filed a direct appeal.  He argued that (1) the trial court erred in overruling his objection to A.D.'s out-of-court statements, (2) the prosecutor deprived him of a fair trial by eliciting testimony about Petitioner's prior probation status, and (3) the last-minute endorsement of a firearms examiner violated his right to due process and proper notice.  In a pro se supplemental brief, Petitioner argued that the prosecutor failed to turn over all the DNA evidence and that his trial attorney was ineffective for failing to object to the lack of DNA evidence.  The Michigan Court of Appeals affirmed Petitioner's convictions, see People v. Robinson, No. 265197, 2007 WL 601449 (Mich. Ct. App. Feb. 27, 2007).  The Michigan Supreme Court denied leave to appeal in a standard order.  See People v. Robinson, 737 N.W.2d 743 (Mich. 2007) (table).

**D.  The State Collateral Proceedings, Habeas Petitions, and Answer**

In 2008, Petitioner moved for relief from judgment, claiming that the evidence at trial was insufficient, that his trial and appellate attorneys were ineffective, and that the cumulative effect of errors required a new trial.  He also claimed that he had established "good cause" for not raising his claims on appeal and "actual prejudice" from the alleged irregularities.  The trial court denied Petitioner's the motion.  The Michigan Court of Appeals dismissed his application for lack of jurisdiction because it was untimely.  See People v. Robinson, No. 294591 (Mich. Ct. App. Feb. 8, 2010).  The Michigan Supreme Court denied leave to appeal in a standard order.  See People v. Robinson, 787 N.W.2d 502 (Mich. 2010) (table).

In 2011, Petitioner filed the instant petition and a motion to stay the petition while he exhausted additional state remedies.  The Court granted Petitioner's motion for a stay and closed this case for administrative purposes.  See Doc. 4.

7

Petitioner subsequently filed a second motion for relief from judgment in the state court.  He argued that:  (1) he was entitled to an evidentiary hearing because he had newly discovered witnesses will exonerate him; (2) trial counsel performed incompetently, and appellate counsel caused him to miss his appellate deadline; and (3) he was entitled to the "watershed rule" announced in Skinner v. Switzer, 562 U.S. 521 (2011).   The trial court denied Petitioner's motion.  The state appellate courts denied leave, citing M.C.R. 6.508(D).  See People v. Robinson, No. 309209 (Mich. Ct. App. Sept. 18, 2012); People v. Robinson, 829 N.W.2d 222 (Mich. 2013) (table).

On July 30, 2013, Petitioner moved through counsel to re-open this case and for permission to file an amended petition for writ of habeas corpus.  See Doc. 7.  The Court granted Petitioner's motion and ordered him to file his amended petition within twenty-one days of the Court's order.  See Doc. 8.  Petitioner filed an amended petition for writ of habeas corpus and supplemental brief, see Doc. 9.  Respondent filed an answer to the petition.  See Doc. 13.

### III.  Standard of Review

28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

"A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.' " Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." Wiggins v. Smith, 539 U.S. 510, 520 (2003) (quoting Williams, 529 U.S. at 413).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly,

> [w]hen reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." Harrington, supra, at 102–103, 131 S.Ct. 770 (internal quotation marks omitted). This is especially true for claims of ineffective assistance of counsel, where AEDPA review must be " ' "doubly deferential" ' " in order to afford "both the state court and the defense attorney the benefit of the doubt." Burt v. Titlow, 571 U.S. ——, –——, 134 S.Ct. 10, 13, 187 L.Ed.2d 348 (2013) (quoting Cullen v. Pinholster, 563 U.S. 170, ——, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011)).

Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (per curiam).

9

In simple terms, the Supreme Court has said that the standard of review is "difficult to meet" and is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  Pinholster, 131 S. Ct. at 1398 (quoting Harrington, 562 U.S. at 102, and Woodford v. Visciotti, 537 U.S. 19, 24 (2002) (per curiam)).  The Supreme Court has further said that a federal court must guard against "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."  Renico v. Lett, 559 U.S. 766, 779 (2010).

Finally, a federal habeas court must presume the correctness of state court factual determinations.  See 28 U.S.C. § 2254(e)(1).  A petitioner may rebut this presumption only with clear and convincing evidence.  Warren v. Smith, 161 F.3d 358, 360-61 (6th Cir. 1998).

## IV.  Petitioner's Claims[1]

### A.  A.D.'s Out-of-Court Statements

Petitioner's first claim is that the trial court erred when it overruled his objections to A.D.'s out-of-court statements to Kimberly Hurst, the physician's assistant who examined A.D. after the crimes.  Petitioner says that Hurst's testimony that A.D.

---

[1]   Respondent asserts that the amended petition is barred from review by the one-year statute of limitations and by Petitioner's failure to comply with deadlines set by the Court in its order granting a stay and its order re-opening this case.  Respondent also says that Petitioner waived or procedurally defaulted some of his claims and that the claims lack merit or are not cognizable on habeas review.

Neither the statute of limitations, nor the procedural-default doctrine, are jurisdictional limitations.  See Holland v. Florida, 560 U.S. 631, 645 (2010) (noting that the statute-of-limitations defense is not jurisdictional) (quoting Day v. McDonough, 547 U.S. 198, 205 (2006)); Trest v. Cain, 522 U.S. 87, 89 (1997).  Because it is more efficient to address the merits of Petitioner's claims rather than to analyze whether the claims are time-barred or procedurally defaulted, any claimed procedural errors are excused.

identified "Vern" as the perpetrator of the crimes. (Trial Tr. Vol. II, 114-15, Aug. 10, 2005.) Petitioner contends that A.D.'s statements to third parties was hearsay.

The Michigan Court of Appeals determined on direct appeal that Petitioner waived review of the issue because trial counsel first explored the issue on cross-examination of Hurst and subsequently provided the jurors with a record of A.D.'s treatment in the emergency room. Even if the claim was not waived, Petitioner raises his claim solely as a violation of state law, and "federal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780 (1990). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991). Because Petitioner has not alleged a violation of his federal constitutional rights, nor cited any Supreme Court decision that the state court's decision was contrary to, or an unreasonable application of, his first claim is not cognizable on habeas review, and relief is not warranted.

### B.  The Prosecutor's Questions and Comments

Petitioner's next claim is that the prosecutor deprived him of his constitutional right to a fair trial by eliciting testimony and commenting on Petitioner's status as a probationer. At trial, the prosecutor also asked Petitioner whether he violated the terms of probation by leaving Michigan after the crimes. Although Petitioner testified that he had permission to leave the State for a funeral in September of 2004 (Trial Tr. Vol. V, 74-75, Aug. 16, 2005), the prosecutor produced a probation supervisor who testified that Petitioner was not granted permission to leave the state in 2004 (id. at 103). Petitioner contends that the prosecutor violated the Michigan Rules of Evidence by

11

introducing evidence of a prior crime to show that Petitioner acted in conformity with his propensity to commit crime when he committed the crimes for which he was on trial.

The Michigan Court of Appeals reviewed Petitioner's claim for "plain error" because Petitioner did not object to the prosecutor's questions about his probationary status.[2]  The Court of Appeals concluded that the prosecutor's questions and comments did not constitute plain error because:  (1) Petitioner first volunteered the information that he was on probation; (2) the evidence was proper because it was relevant to the question of whether Petitioner left the state for innocent reasons or because of consciousness of guilt; (3) the prosecutor did not use the evidence for the improper purpose of attacking Petitioner's general credibility, and the prosecutor did not argue that Petitioner was not a credible witness because of his probationary status; and (4) the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

Petitioner's claim asserts a violation of Michigan's Rules of Evidence which is not a cognizable claim on federal habeas review.  Hall v. Vasbinder, 563 F.3d 222, 239 (6th Cir. 2009).  Additionally, "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."  Bugh v. Mitchell,  329 F.3d 496, 512 (6th Cir. 2003).  Consequently, "there is no Supreme Court precedent that the trial court's decision could be deemed 'contrary to' under AEDPA."  Id. at 513.

---

[2]  Trial counsel objected to the prosecutor's questions about Petitioner's failure to report to his probation officer in July or August of 200.  However, he did not object to the prosecutor's questions regarding whether Petitioner was under a court order not to leave the State in July of 2004 and whether he nevertheless left the State.  (Trial Tr. Vol. V, 74-77, Aug. 16, 2005.)

Even if the claim could be considered, it lacks merit.  Officer James Wiencek,
testified that he obtained a federal flight warrant for Petitioner's arrest when he was
unable to locate Petitioner and after he was informed that Petitioner was in Ohio.
Wiencek went on to say that, in mid-August or September of 2004, he turned the case
over to a law enforcement unit that dealt with repeated offenders.  (Trial Tr. Vol. III, 197-
200, Aug. 11, 2005.)  Given this testimony and the trial court's instruction not to let
prejudice influence the jurors' decision (Trial Tr. Vol. V, 186, Aug. 16, 2005), evidence
that Petitioner violated the terms of probation by going to Ohio without permission could
not have had a " 'substantial and injurious effect or influence' " on the jury's verdict, and
was harmless.  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v.
United States, 328 U.S. 750, 776 (1946)).  Overall, Petitioner is not entitled to relief on
this claim.

### C.  Late Endorsement of the Firearms Examiner

Petitioner's third claim relates to the late endorsement of a firearms examiner as
a prosecution witness.  The witness, Officer Lloyd Allen, was permitted to testify about
tests that he performed on spent bullets in evidence even though he did not perform the
tests until after the trial began.  Petitioner contends that the trial court erred and violated
his right to notice and due process of law by ruling that the prosecutor could amend his
witness list to include Officer Allen.

A defendant in a criminal case has a "right to notice of the charges against which
he must defend," "[b]ut a defendant's claim that he has a right to notice of the evidence
that the state plans to use to prove the charges stands on quite a different footing."
Gray v. Netherland, 518 U.S. 152, 167-68 (1996) (emphasis in original).  "There is no

general constitutional right to discovery in a criminal case," Weatherford v. Bursey, 429

U.S. 545, 559 (1977), and the Supreme Court's "cases do not compel a court to order

the prosecutor to disclose his evidence . . . ." Gray, 518 U.S. at 168. "A decision

regarding the endorsement of a witness generally constitutes a state law matter within

the trial court's discretion . . . ." Warlick v. Romanowski, 367 F. App'x 634, 643 (6th Cir.

2010); see also Hence v. Smith, 37 F. Supp. 2d 970, 982 (E.D. Mich. 1999) (stating that

"numerous cases have held that the state's failure to endorse a witness prior to calling

that witness to testify does not violate any federal constitutional right and is not grounds

for federal habeas relief").

　　　　Even if Petitioner's constitutional rights were implicated by the late endorsement

of Officer Allen, he was not prejudiced by the trial court's decision to allow him to testify.

As the Michigan Court of Appeals pointed out on direct appeal,

> [t]he only significance of the firearm examiner's testimony was that three
> bullets recovered from the crime scene were fired from the same weapon.
> No weapon was ever recovered and nothing in the examiner's testimony
> linked the bullets to defendant.

Robinson, 2007 WL 601449, at *2; see also Trial Tr. Vol. IV, 111-12, Aug. 15, 2005.

Trial counsel, moreover, was permitted to review Officer Allen's written report during a

break in the trial (Trial Tr. Vol. IV, 96, Aug. 15, 2005) and had an opportunity to cross-

examine and re-cross-examine Officer Allen regarding his findings (id. at 115-144, 148-

54). Petitioner is not entitled to relief on this claim.

### D. Sufficiency of the Evidence

　　　　Petitioner's next claim is that the evidence at trial was insufficient to sustain his

convictions for first-degree criminal sexual conduct, kidnapping, assault with intent to do

great bodily harm less than murder, and felony firearm. He contends that his

convictions were based primarily on A.D.'s testimony and that there was no physical evidence linking him to the crimes.  He points to minor discrepancies between A.D.'s testimony and her statements to the police, such as the fact that she failed to tell Officer Kimree Beckem that the sexual penetration occurred in a bedroom.  Petitioner also points out that no sperm or semen were detected on swabs taken from A.D. or on the condoms found in Petitioner's trash.  Petitioner contends that the lack of DNA evidence tying him to the crime should have been enough to exonerate him.

Petitioner raised his sufficiency-of-the evidence claim in his first motion for relief from judgment.  The trial court rejected the claim without addressing the elements of the offenses or the evidence at trial.  The trial court merely stated that it was satisfied the jury was presented with sufficient evidence to support the prosecution's theory, as well as the defense theory, and that the jury resolved the issue by finding Petitioner guilty beyond a reasonable doubt.

### 1.  Legal Framework

The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.  But this inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt."  Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Jackson v. Virginia, 443 U.S. 307, 318–19 (1979) (internal citation and footnote omitted) (emphases in original).  This standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."  Id. at 324 n. 16.

### 2.  Application

### a.  Criminal Sexual Conduct

In Michigan, the elements of first-degree criminal sexual conduct, as charged in this case, are sexual penetration with another person and one of the following aggravating circumstances:  the commission of another felony during the sexual penetration; the actor was aided or abetted by another person and force or coercion was used to accomplish the sexual penetration; the actor was armed with a weapon; or the actor caused personal injury to the victim, and force or coercion was used to accomplish sexual penetration.  Mich. Comp. Laws § 750.520b(1)(c)-(f).

As described above, A.D. testified that Petitioner threatened to kill her and used force or coercion to penetrate her vagina with his penis.  A.D. also testified  that Petitioner was armed with a gun during the incident, that he punched her on the face, and that he hit her with a gun.  Her testimony satisfied the elements of first-degree criminal sexual conduct as charged in count one, because she established that Petitioner sexually penetrated her during the commission of another felony (an assault or kidnapping).  She also established that Petitioner was armed with a weapon during the assault and that he injured her and used force or coercion to accomplish sexual penetration.  Contrary to what Petitioner asserts, her testimony did not have to be corroborated.  See M.C.L. § 750.520h.  As such, the evidence was sufficient to convict him on count one.

In count two, Petitioner was charged with first-degree criminal sexual conduct as an aider and abettor.  A.D. testified that Petitioner asked "D" whether he wanted to have sex with A.D. and that "D" then penetrated her vagina with his penis while Petitioner

stood nearby with a gun in his hand.  A.D. claimed that she did not want to engage in this act of sexual intercourse.  This testimony satisfies the elements of first-degree criminal sexual conduct as charged in count two because A.D. established that Petitioner aided and abetted another person in sexually penetrating her and used a gun to coerce the penetration.  Habeas relief is not warranted.

### b.  Kidnapping

To prove kidnapping, as it was defined in 2004, the prosecutor had to show that Petitioner "willfully, maliciously and without lawful authority . . . forcibly or secretly confined or imprisoned any other person within this state against h[er] will . . . . ." People v. Wesley, 365 N.W.2d 692, 694 (Mich. 1984).

Again as noted above, A.D. testified that Petitioner forced her into the basement of the house on Selkirk and then tied her to a pole.  She testified that she remained in the basement from that morning until night when Petitioner said that she could put on her clothes and go upstairs.  Although Petitioner subsequently left the house, she remained there for several hours (until 2:00 a.m. the next day) because Petitioner made someone watch her and she was sore from being beaten and raped.  This testimony was sufficient to show that Petitioner willfully, maliciously, and unlawfully confined A.D. in the house against her will.

### c.  Assault

To prove assault with intent to do great bodily harm less than murder, M.C.L. § 750.84, the state had to show "(1)) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less

17

than murder." People v. Brown, 703 N.W.2d 230, 236 (Mich. Ct. App. 2005) (quoting People v. Parcha, 575 N.W.2d 316, 318 (Mich. Ct. App. 1997)).

Here, A.D. testified that Petitioner threatened to kill her, choked her until she could not breathe, hit her with a gun, and tortured her with a hot clothes hanger. This testimony was sufficient to show an attempt or threat to do corporal harm to A.D. and an intent to do great bodily harm less than murder.

### d. Felony Firearm

The elements of felony firearm are possession of a firearm during the commission of, or attempt to commit, a felony. Mich. Comp. Laws § 750.227b(1); People v. Avant, 597 N.W.2d 864, 869 (Mich. Ct. App. 1999). A.D. testified that Petitioner was armed with a gun throughout the incident at the house on Selkirk. (Trial Tr. Vol. III, 96, Aug. 11, 2005). This was sufficient evidence to show that he possessed a firearm during the commission of multiple felonies, including criminal sexual conduct, kidnapping, assault with intent to commit great bodily harm, and assault with a dangerous weapon.

### 3. Summary

A rational juror could have concluded from the evidence in the light most favorable to the state that Petitioner committed two counts of first-degree criminal sexual conduct, that he kidnaped A.D., that he assaulted A.D. with intent to do great bodily harm less than murder, and that he possessed a firearm during the commission of one or more felonies. Consequently, the state trial court's decision – that the evidence was sufficient to sustain Petitioner's convictions – was not contrary to, or an

unreasonable application of, <u>Jackson</u>.  Petitioner is not entitled to habeas relief on the basis of the challenge to the sufficiency of the evidence.

### E.  Trial Counsel's Failure to Investigate Witnesses and Evidence

In his fifth and seventh claims, Petitioner asserts that trial counsel failed to investigate and interview witnesses who would have exonerated Petitioner at trial. Specifically, Petitioner contends that, if trial counsel had investigated and contacted Roy Robinson, Eddie L. Myers, Cassandra Thomas, and Freddie Lee Allen, trial counsel would have discovered that A.D. was fabricating the charges against him because she was in love with him, had an ongoing sexual relationship with him, and was angry with him for avoiding her and not giving her the attention she sought.

Petitioner also claims that, if trial counsel had investigated a police report, he would have discovered that A.D. informed the police that someone named "Duck" sexually assaulted her.  Finally, Petitioner claims that trial counsel abandoned him due to a dispute over attorney fees.

The trial court addressed Petitioner's claim about Eddie L. Myers and Roy Robinson in its opinion on Petitioner's first motion for relief from judgment.  The trial court concluded that Myers' and Robinson's affidavits did not buttress Petitioner's claim of innocence and that trial counsel's failure to call either of them as a witness was trial strategy, as their testimony would not have caused a different result in the proceedings.

Petitioner raised this claim again in his second motion for relief from judgment. This time, he supported his claim with the affidavits of Freddie Lee Allen, Cassandra Thomas, Latosha McLaurin, and Daniel Jones.  The trial court, however, stated that the

affidavits failed to clearly exculpate Petitioner and would not have made a different result probable on retrial.

## 1. Clearly Established Federal Law

The Supreme Court's decision in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), is clearly established federal law for purposes of Petitioner's ineffective-assistance-of-counsel claim. <u>Pinholster</u>, 563 U.S. at 189. Under <u>Strickland</u>, a defendant must show that his trial attorney's "performance was deficient" and "that the deficient performance prejudiced the defense." <u>Strickland</u>, 466 U.S. at 687. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." <u>Id</u>.

The "deficient performance" prong of the <u>Strickland</u> test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id</u>. "Judicial scrutiny of counsel's performance must be highly deferential." <u>Id</u>. at 689.

To demonstrate that counsel's performance prejudiced him, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id</u>. at 694. "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' " but "[t]he likelihood of a different result must be substantial, not just conceivable." <u>Harrington</u>, 562 U.S. at 111-12 (quoting <u>Strickland</u>, 466 U.S. at 693).

Although "[t]he failure to call favorable witnesses can amount to ineffective assistance where it results in prejudice to the defense," <u>Pillette v. Berghuis</u>, 408 F.

App'x 873, 884 (6th Cir. 2010), " '[a] defense counsel has no obligation to call or even interview a witness whose testimony would not have exculpated the defendant.' " Millender v. Adams, 376 F.3d 520, 527 (6th Cir. 2004) (quoting Millender v. Adams, 187 F. Supp.2d 852, 877 (E.D. Mich. 2002)).  And "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  Strickland, 466 U.S. at 690.

### 2.  Application

In the affidavit, which Petitioner submitted to the trial court on collateral review, Petitioner states that trial counsel told him that Roy Robinson and Eddie L. Myers would not make good witnesses because Roy was in federal prison and Eddie was in jail.  See Amended Pet. for Writ of Habeas Corpus, Ex. B, ¶ 39.  Thus, trial counsel did consider using Roy Robinson and Eddie L. Myers as witnesses, but rejected the idea for strategic reasons.  This does not constitute ineffectiveness.

Petitioner states that his sister, Cassandra Thomas, would have provided evidence of his incestuous relationship with A.D.  Petitioner admits, however, in the affidavit that he presented to the trial court that Cassandra refused to provide him with a statement regarding what may have led to the charges against Petitioner.  If Cassandra was unwilling to provide Petitioner with a statement, she surely would not have been willing to testify in Petitioner's behalf at trial.  Thus, trial counsel was not ineffective in failing to call her as a witness.

Freddie Lee Allen states in an affidavit dated over five years after the trial that he did not notice any disrespect between Petitioner and A.D. on the day and night in question and that he never saw Petitioner beat or rape anybody.  At best, all he could

21

have said was that Petitioner was a good person and that he (Freddie) did not observe the crime.

As for Darrell Jones, whose affidavit also is attached to the amended petition, he merely states that he observed Petitioner's trial counsel argue with Petitioner about attorney fees in a court hallway. This allegation does not pertain to Petitioner's guilt or innocence and would not have made a difference at trial.

Even if the witnesses would have been willing to testify that A.D. fabricated her allegations against Petitioner because she was in love with him and was jealous of his wife, it is unlikely that such testimony would have changed the result of the trial because it was inconsistent with all the other evidence in the case. A.D. testified that she was close to Petitioner, but she gave no indication that she was romantically involved with him. In fact, she claimed that she lived with another man off and on for years before the incident with Petitioner and that she had not completely severed her relationship with that man at the time of the incident with Petitioner. She also testified that she did not consent to sex with Petitioner, and that she begged Petitioner to stop doing the things he was doing to her on July 1, 2004.

A.D.'s testimony was consistent with what she told the police and medical professionals after the crimes. Her testimony also was corroborated by the spent bullets, rope, extension cord, and chair found in the basement of the house on Selkirk and the condoms and clothes hanger found in the trash bag on the first floor of the house.

Furthermore, Petitioner himself never mentioned an ongoing sexual relationship with A.D. or A.D.'s jealousy when he testified at trial. In fact, he denied ever having sex

with A.D. (Trial Tr. Vol. V, 90, Aug. 16, 2005), and he claimed that, after the incident, he heard that A.D. was making accusations about somebody named "D."  He denied knowing that A.D. had accused him of anything.  (Id. at 78.)

Petitioner has failed to overcome the presumption that, under the circumstances, trial counsel's failure to investigate and interview Roy Robinson, Eddie L. Myers, Cassandra Thomas, Freddie Lee Allen, or Darrell Jones was sound trial strategy. Furthermore, the trial court reasonably concluded that the potential witnesses' affidavits failed to clearly exculpate Petitioner and that the witnesses would not have made a different result probable on retrial.

Petitioner also has failed to show that trial counsel abandoned him due to a dispute over attorney fees.  The record indicates that trial counsel was tireless in his efforts to defend Petitioner.

The record further belies Petitioner's claim that trial counsel did not investigate a police report that "Duck" sexually assaulted A.D.  Trial counsel obviously was aware of the police report, because he asked Officers James Wiencek and Stacey Cavin about "Duck" at trial.  Officer Wiencek admitted in response to trial counsel's question that he was informed of "Duck," but that A.D. did not give him "Duck's" address, and that she knew only his street name.  (Trial Tr. III, 217, Aug. 11, 2005.)  Officer Cavin testified that A.D. had said she was assaulted by someone named "Duck."  (Trial Tr. Vol., IV, 184, Aug. 15, 2005.)

For all the reasons given above, trial counsel's performance was not deficient and the allegedly deficient performance did not prejudice Petitioner.  Petitioner therefore

has no right to relief on the basis of his claim about trial counsel's alleged failure to investigate evidence and interview potential witnesses.

### F.  Appellate Counsel

Petitioner further claims that appellate counsel rendered ineffective assistance by failing to raise all his claims on direct appeal.  Petitioner asserts that the issues he raised on collateral appeal were stronger than the issues counsel raised on direct appeal.

Petitioner raised his claim in his first motion for relief from judgment.  The trial court adjudicated the claim on the merits and concluded that appellate counsel was not ineffective for failing to raise the issues on appeal because the claims were meritless, and an attorney is not ineffective for failing to make meritless arguments.

The Supreme Court has stated that an appellate attorney is not required to raise every non-frivolous claim requested by his or her client if counsel decides, as a matter of professional judgment, not to raise the claim.  Jones v. Barnes, 463 U.S. 745, 751 (1983).  To demonstrate that appellate counsel was ineffective, a habeas petitioner must show (1) that his attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal and (2) there is a reasonable probability that he would have prevailed on appeal if his attorney had raised the issues.  Smith v. Robbins, 528 U.S. 259, 285 (2000) (citing Strickland, 466 U.S. at 687-91, 694); Etherton v. Rivard, 800 F.3d 737, 748 (6th Cir. 2015), petition for cert. filed, No. 15-723 (U.S. Dec. 3, 2015).

The habeas claims that Petitioner failed to raise on direct appeal lack merit for the reasons given above:  A.D.'s testimony was sufficient to satisfy the elements of the crimes, and trial counsel was not ineffective for allegedly failing to investigate and

interview witnesses that Petitioner claims would have exonerated him. Therefore, appellate counsel's failure to raise those claims on direct appeal did not constitute deficient performance. The claims lack merit, and, "by definition, appellate counsel cannot be ineffective for a failure to raise an issue that lacks merit." Greer v. Mitchell, 264 F.3d 663, 676 (6th Cir. 2001). The trial court reasonably concluded the same. Petitioner is therefore not entitled to relief on his claim regarding appellate counsel.

### V. Conclusion

For the reasons stated above, the state-court decisions in this case were not contrary to Supreme Court precedent, unreasonable applications of Supreme Court precedent, or unreasonable determinations of the facts. The state-court decisions also were not "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103.

Accordingly, the petition for a writ of habeas corpus is **DENIED**. This case is **DISMISSED**.

### VI. Certificate of Appealability

In order to appeal the Court's decision, Petitioner must obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. Slack v. McDaniel, 529 U.S. 473, 483-84 (2000). A federal district court may grant or deny a certificate of

appealability when the court issues a ruling on the habeas petition. <u>Castro v. United States</u>, 310 F.3d 900, 901 (6th Cir. 2002).

Here, reasonable jurists would not disagree with the Court's resolution of Petitioner's constitutional claims, nor conclude that the issues deserve encouragement to proceed further.  The Court therefore DECLINES to grant a certificate of appealability.

**SO ORDERED.**


<u>s/Avern Cohn</u>
AVERN COHN
Dated: January 7, 2016                    UNITED STATES DISTRICT JUDGE
      Detroit, Michigan